(February 13, 1915.)

## CHARLES VERHEYEN, Respondent, v. E. H. DEWEY and NAMPA & MERIDIAN IRRIGATION DISTRICT, Appellants.

[146 Pac. 1116.]

DAMAGE—IRRIGATION SYSTEM — SEEPAGE — FLOODS — JOINT TRESPASS— FINDINGS OF FACT—MALICIOUS ACTS—JOINT TORT-FEASORS—EVIDENCE—ADMISSION OF—RISING WATER-TABLE—INSTRUCTIONS—NONSUIT.

1. Where damages to real and personal property are sought to be recovered from two defendants, and it is alleged in the complaint that such damages were caused by the wrongful and wilful acts of the defendants, in the joint operation and management of a canal system and reservoir, and the evidence shows that one of the defendants is the owner and has operated, managed and controlled such canal and reservoir, and that the other defendant had no title or interest therein, and that such defendant did not manage or control or join in the management and control of such system, and judgment is entered on such evidence against both defendants jointly, the judgment will be set aside and a new trial granted.

2. *Held,* under the evidence that the water was drawn out of Lake Ethel reservoir under the direction of the general manager of the irrigation district, not maliciously, but for the purpose of protecting said irrigation works and the inhabitants of Mason creek basin.

3. The defendants are charged as joint tort-feasors, and where two or more parties act each for himself and independently of each other in a matter that results injuriously to another, they cannot be held jointly liable for the acts of each other.

4. An action at law for damages cannot be maintained against several defendants jointly when each acted independently of the other and there was no concert or unity of design between them; and the tort does not become joint because afterward its consequences

Idaho, Vol. 27—1

united with the consequences of several other torts committed by other persons.

5. *Held,* that if the defendant Dewey, acting for himself, opened up the gates of Lake Ethel reservoir and injured the personal property of the plaintiff, the defendant irrigation district is not liable for such unlawful acts of Dewey; and further *held* that Dewey, having no interest whatever in said irrigation district, could not be held personally liable for the damages done on account of seepage from said system.

6. *Held,* under the evidence in this case that neither of the defendants could be held liable for damages resulting from natural floods flowing down said Mason creek valley.

7. *Held,* that the giving of instructions Nos. 3, 4 and 9 was reversible error.

8. *Held,* that the denial of defendant Dewey's motion for a nonsuit was error.

APPEAL from the District Court of the Seventh Judicial District for Canyon County. Hon. Ed. L. Bryan, Judge.

Action to recover damages alleged to have been caused by the illegal and malicious acts of the defendants. Judgment for the plaintiff. *Reversed.*

H. E. McElroy, Scatterday & Van Duyn and D. Worth Clark, for Appellants.

As to seepage, we contend that the complaint does not state facts sufficient to constitute a cause of action, because no negligence or carelessness in the construction or maintenance of said canal or reservoir is alleged. (*Fleming v. Lockwood,* 36 Mont. 384, 122 Am. St. 375, 92 Pac. 962, 13 Ann. Cas. 263, 14 L. R. A., N. S., 628.)

Instruction No. 9 which clearly was to the effect that the jury had the right to award exemplary damages and not only against one defendant, but against both, and permitted them to jointly assess the exemplary damages, although each defendant acted separately, is erroneous. (*Nightingale v. Scannell,* 18 Cal. 315; *City Water Power Co. v. Fergus Falls,* 113 Minn. 33, Ann. Cas. 1912A, 108, 128 N. W. 817; *McCarron v. O'Connell,* 7 Cal. 152; 38 Cyc. 1161.)

The defendants could not be held liable on account of the manner of construction of the ditch or reservoir, because it had existed for such a period prior to the time that plaintiff purchased the land in question that no liability could exist on account of the construction or maintenance of the same, even if a proper allegation had been made. (*St. Louis & S. W. R. R. Co. v. Long,* 52 Tex. Civ. App. 42, 113 S. W. 316.)

The plaintiff wholly failed to prove the joint cause of action alleged, and we claimed a peremptory instruction, disposing of the case under the authority of *Livesay v. First National Bank of Denver,* 36 Colo. 526, 118 Am. St. 120, 86 Pac. 102, 6 L. R. A., N. S., 598, where the court held that "a failure to prove joint liability of persons charged as joint tort-feasors is a failure to prove the cause of action alleged." (*Mau v. Stoner,* 15 Wyo. 109, 87 Pac. 434, 89 Pac. 466.)

Defendants cannot be required to pay loss for which they are not responsible. (*Miller v. Highland Ditch Co.,* 87 Cal. 430, 22 Am. St. 254, 25 Pac. 550.)

Griffiths & Griffiths, for Respondent.

The amended complaint alleges acts of negligence on the part of defendants in causing water to both seep through and flow over and injure the property of plaintiff. (3 Kinney on Irrigation and Water Rights, pp. 3087–3089.)

The construction of irrigation works in such a place and manner as to cause seepage in such manner and quantity as to damage other lands without providing proper and adequate drainage to prevent the damage is of itself negligence. (*Howell v. Big Horn Basin Colonization Co.,* 14 Wyo. 14, 81 Pac. 785, 1 L. R. A., N. S., 596.)

A prescriptive right to act negligently cannot be acquired, no matter how long practiced. (3 Kinney on Irrigation and Water Rights, pp. 3084, 3085.)

It is not necessary that the acts of tort-feasors should be but a single act, or joint, or should not be separate as to place and time, in order to render the parties liable jointly; but

if they culminate in producing a nuisance which injures the person or property of another, or if their concurring negligence occasions the injury, then they are jointly and severally liable in the highest degree. (*Miller v. Nor. Pac. Ry. Co.,* 24 Ida. 567, 135 Pac. 845, 48 L. R. A., N. S., 700; *Hillman v. Newington,* 57 Cal. 56; *Slater v. Mersereau,* 64 N. Y. 138; 38 Cyc. of Law & Proc. 488, and notes; *City of Valparaiso v. Moffitt,* 12 Ind. App. 250, 54 Am. St. 522, 39 N. E. 909; *Allison v. Hobbs,* 96 Me. 26, 51 Atl. 245; *Corey v. Havener,* 182 Mass. 250, 65 N. E. 69; *Green v. Davies,* 100 App. Div. 359, 91 N. Y. Supp. 470; *Strauhal v. Asiatic S. S. Co.,* 48 Or. 100, 85 Pac. 230; *Day v. Louisville C. & C. Co.,* 60 W. Va. 27, 53 S. E. 776, 10 L. R. A., N. S., 167; *Olsen v. Upsahl,* 69 Ill. 273; *Blanchard v. Burbank,* 16 Ill. App. 375; *Drake v. Kiely,* 93 Pa. 492; *Walker v. Read,* 59 Tex. 187; *McFadden v. Schill,* 84 Tex. 77, 19 S. W. 368; *Gerhardt v. Swaty,* 57 Wis. 24, 14 N. W. 851; *Cuddy v. Horn,* 46 Mich. 596, 41 Am. Rep. 178, 10 N. W. 32; *Kirby v. Del. & H. Canal Co.,* 90 Hun, 588, 35 N. Y. Supp. 975.)

"Where the principal commands the wrong to be done, and therefore personally participates in it, the two may be sued jointly. They are in no different position than any other joint tort-feasors. If there are two or more principals, one or all or any number may be joined." (Huffcut on Agency, 2d ed., p. 266; *Weber v. Weber,* 47 Mich. 569, 11 N. W. 389; *Hamlin v. Abell,* 120 Mo. 188, 25 S. W. 516; *Stiewel v. Borman,* 63 Ark. 30, 37 S. W. 404; 10 Cyc. of Law & Proc. 920, 931, 933; *Crane v. Onderdonk,* 67 Barb. (N. Y.) 47.)

SULLIVAN, C. J.—This action was brought to recover damages resulting from an alleged trespass on real and personal property by flooding and seepage from the canal system of the defendant, the Nampa & Meridian Irrigation District.

This is a companion case to *Doran v. Dewey et al., post,* p. 25, 146 Pac. 1124, which was orally argued by respective counsel with the case at bar. These two cases involve practically the same questions of law and fact, although the

alleged ·damages occurred to different tracts of land and different personal property.

The respondent in this case alleged, among other things, in his amended complaint, that he was the owner of twenty-one acres of land situated on Mason creek flat, about two miles northeast of the city of Nampa, and that he had this tract in a good state of cultivation and had growing thereon about 900 apple trees, 300 peach trees, 50 cherry trees, 200 grape vines, berry bushes and shrubbery, all of which, as well as certain personal property, was destroyed by reason of the flooding of said land and seepage from the Nampa & Meridian Irrigation District system, and that the whole loss sustained aggregated $38,815.40; and prayed for damages for that sum.

A demurrer to said amended complaint was overruled and the defendants answered. The case was thereafter tried to a jury and a verdict was returned in favor of the plaintiff in the sum of $8,315.40, and judgment was entered for that amount. A motion for a new trial was interposed and denied, and this appeal is from that order and from the judgment, as well as from an order of the court taxing costs.

Eight errors are assigned, which go to the action of the court in overruling the appellant's demurrer to the amended complaint and defendants' motion to strike from the amended complaint certain portions thereof; the overruling of defendants' motion to tax costs; the giving and refusing to give certain instructions; the denying of defendants' motion to strike out certain parts of the testimony, and the denying of the motion of defendant Dewey for a nonsuit.

The following facts are disclosed by the record:

The land of the plaintiff is situated in the midst of what is known as Mason creek flat, about two miles nearly north of the town of Nampa. The valley slopes from the south to the north at from ten to fifteen feet to the mile. The Mason creek valley is only about one-third of a mile from Indian creek, at a point near Lake Ethel. The Mason creek basin

receives the surface drainage from several thousand acres of land. Said creek rises some ten or fifteen miles southeast of the land of plaintiff and runs in a northwesterly direction to Boise river, and is the natural drainage channel for said basin. The land of the plaintiff is located in the Pioneer Irrigation District and is irrigated from the Phyllis canal, which passes easterly and southeasterly of plaintiff's land at a distance of about a mile. The Nampa & Meridian irrigation District adjoins or is near the Pioneer Irrigation District on the south. Its canal system consists of the main Ridenbaugh canal, which crosses Mason creek basin about five miles southeast from plaintiff's land, together with the high-line canal crossing the same basin still higher up. Next above this is what is known as the New York canal, or the canal of the United States Reclamation Service. The reservoir known as Lake Ethel is an artificial lake made by means of a dam in Mason creek about one and a half miles above plaintiff's land. The channel of Mason creek is through Lake Ethel, which covers about twenty-three acres of land and holds water to the average depth of about four feet and when full holds about 112 acre-feet of water. Plaintiff's land is situated in the level basin or channel of said creek, which channel terminates about three-fourths of a mile above plaintiff's land, and the channel again begins at about a mile below plaintiff's land. Thus for about a mile and three-quarters there is no natural channel across said basin, and the water coming to the upper end of said basin or flat must either seep or percolate into the soil, or, if it comes in large quantities, overflow the basin and spread out over the entire Mason creek flat and flow on down the valley to the point where the channel begins again.

Much of the land in this vicinity has been irrigated for some fifteen or twenty years from the said Phyllis canal, while lands farther up Mason creek valley have been irrigated for fifteen years or more from the Ridenbaugh canal, while thousands of acres of new land, naturally draining into Mason creek or valley, have been placed under cultivation

during the four or five years preceding the trial of this action, by water from said New York canal.

The topography of the locality of said Mason creek valley or basin was shown by several maps introduced in evidence, and by oral testimony on the trial. Said basin or valley is subject to natural floods from rain and snow in the winter, and in the summer a large amount of waste water runs off from and percolates the irrigated land situated in said basin.

As above stated, the maximum capacity of Lake Ethel reservoir is 112 acre-feet of water, and the water from that reservoir is not used for irrigation purposes. If the entire contents of said Lake Ethel were spread out over the surface of Mason creek flat, it would cover it to about a depth of two and a half inches, which is a less amount of water than is ordinarily used by the average Idaho farmer on his land at a single irrigation.

The original complaint in this action was substantially a copy of the complaint in the case of *Doran v. Dewey et al.,* but the amended complaint alleges the turning out of water into Mason creek directly from the canal of the defendant corporation, as well as from said Lake Ethel. The answer of the defendants denied turning out water into Mason creek, either from the canal system or from Lake Ethel, except on January 13, 1912, and denied that any injuries resulted on that occasion. Paragraphs 3 and 4 of defendants' answer set forth in detail their contention in this case, and it is there averred that the land of plaintiff, together with the improvements constituting realty, such as orchard trees, shrubbery, etc., is being gradually destroyed by the underground seepage waters unavoidably resulting from the lawful use of water for irrigation in said Mason creek basin, and that in any event defendants could only be held liable for the part of such injury resulting from an unlawful flooding by the defendants wholly independent of the common injury resulting from seepage from other sources, which, it is contended, plaintiff must prove by competent evidence; that if defendants or any land owner or canal owner in Mason creek basin unlawfully turns out water so as to injure the land of plain-

tiff, the law affords plaintiff a sure remedy by injunction, and that the only practical remedy for injury from underground seepage waters resulting from the lawful use of water for irrigation is by drainage.

The amended complaint charges a trespass by the defendants from February, 1910, to November, 1912. The evidence shows two surface floodings of the land in Mason creek flat in the month of February, 1910, one in the month of October, 1911, and one about January 13, 1912. It is not contended that from February, 1910, to November, 1912, there were any surface floodings except those above mentioned. An injunction was asked and on that question the trial court made the following findings:

"That the lard of plaintiff is situated in what is known as Mason creek basin, which is comparatively flat and level, with an incline or fall of from ten to fifteen feet to the mile, through which the natural drainage of said Mason creek passes; but that the said land of plaintiff is not situated in the lowest part of said basin. That said Mason creek is the natural drainage channel for a large area of land situated above the land of plaintiff, and has a channel over a portion of its course, but has not now and never did have a natural channel or defined course or banks over the land of plaintiff or in the vicinity of plaintiff's land.

"That said Lake Ethel is an artificial lake or reservoir constructed in the bed of Mason creek at a point approximately one mile above and south of the land of plaintiff.

"That the surface of the water under the said land of plaintiff eight years prior to the commencement of this action was forty feet below the surface of the ground and at the time this action was commenced was from sixteen to thirty inches below the surface of the ground on plaintiff's land.

"That the defendant, the Nampa & Meridian Irrigation District and its predecessors in interest, have maintained, operated and used said Ridenbaugh canal system for diverting waters from their natural channels and distributing portions of the same for irrigation and discharged portions into Mason creek, and have maintained water in Lake Ethel and

discharged water therefrom for a period of more than twenty years.''

Those findings of the trial court and the evidence in the case clearly show that defendant Dewey had no interest, estate or title in the Ridenbaugh canal system, which system is owned and controlled by the Nampa & Meridian Irrigation District, Dewey's codefendant, and there is no evidence contained in the record to sustain or prove the following allegation of the complaint, to wit:

''That during the years 1910, 1911 and 1912 defendants so operated, managed and controlled said canal and reservoir as to continuously divert from their natural channels and carry to and discharge into said Mason creek basin large quantities of water and to store and maintain within said reservoir large portions of said waters, and carelessly, wrongfully and wilfully failed, neglected and refused to provide and maintain proper, adequate or reasonable drains and waste-ways for the proper or reasonable control of said waters,'' etc.

It appears from the evidence that Daniel A. Barker, a witness on behalf of the defendants, testified that he was managing director of the Nampa & Meridian Irrigation District, and that he had been director of that district for six years prior to the trial of this case and was manager of the district for three years prior to the trial of the case. In response to the following question he testified as follows: ''Q. Explain the circumstances under which the water was turned out of Lake Ethel in the month of January, 1912? A. The country was covered with a heavy fall of snow; we expected a very heavy run-off of surplus water, and amongst other precautions to guard against damage by this water I suggested to Mr. Dewey over the telephone that he let the water gradually out of the lake in advance of this expected flood, and suggested to him that he take out one board at a time and let that water drain out, and then take another out.''

Mr. Henry, who was in the employ of Mr. Dewey, testified that under the instructions of Mr. Dewey he proceeded to take out some of the boards of the gate for the purpose of lowering said lake, and testified: ''One day he [Dewey] told

me to drain it and I didn't drain it until the next day, and he got quite emphatic the next time; he called me up over the phone and told me, 'You had better drain it,' he said 'The people below would be flooded out if we don't let the water low enough down so as to catch the surplus . . . . water that came down,' " and told Henry to let the water out gradually.

The evidence in this case shows that Dewey had the boards of the gate taken out at the request of the general manager of said irrigation district and that he and said general manager did not act maliciously in having said work done, and that it was done under direction of the manager of the irrigation district and not by Dewey on his own behalf.

The court in its findings of fact found that the defendant, the Nampa & Meridian Irrigation District, and its predecessors in interest, had maintained, operated and used said Ridenbaugh canal system for diverting waters from their natural channels and distributing portions of the same and discharging portions into Mason creek, and maintained water in Lake Ethel and discharged water therefrom for a period of more than twenty years; but it nowhere finds that Dewey did any of those acts or had any interest therein or performed any of the acts there referred to. The court further found that during the period between February 8, 1910, and November 11, 1912, said irrigation district so operated, managed and controlled said canal system as to continuously divert from their natural channels certain waters and to discharge them into Mason creek basin to the damage of the plaintiff; and the court further found that the defendant Dewey caused the outlet of said reservoir to be opened and caused the contents of the same to flow down upon the plaintiff's land during the summer months of the years 1910 and 1911, and that on or about the 12th or 13th of January, 1912, said Dewey caused a large amount of water stored in Lake Ethel to be turned out into the bed of Mason creek, which flowed down upon the lands of the plaintiff.

It will be observed from the last-mentioned finding that Dewey personally did the acts there stated, and then the court arrives at the remarkable conclusion that "Defendants

wrongfully and unlawfully caused plaintiff irreparable injury and great damage and loss.'' The theory of the trial court evidently was that because the irrigation district owned, maintained and operated said canal system, and that Dewey personally turned some water out therefrom, both were guilty alike for the damages alleged to have been sustained by the plaintiff. The acts which the court found that Dewey did were specific trespasses, and the seepage resulting from said canal system was a continuous act disassociated from the specific acts which Dewey did. They are all joined together by the trial court, and both defendants are held liable for the acts of Dewey and for the seepage resulting from said system.

It is contended by counsel for appellant that respondent in his complaint attempts to allege a joint cause of action for damages from seepage against Dewey and the irrigation district, knowing that Dewey had no interest, estate or title in said reservoir and said irrigation system and could not be liable for the defects in its construction, and that the court erred in admitting in evidence a conversation that the plaintiff and others claimed to have had with defendant Dewey several years prior to the commencement of this action and prior to the date when the appellant district owned said canal and irrigation system, and at a time when defendant Dewey had nothing whatever to do with said system himself. This testimony was admitted over the objection of the defendant, and counsel for respondent comments upon this evidence as showing the malicious conduct of said Dewey, and thus attempts to base thereon a claim for punitive damages against the irrigation district as well as against Dewey.

It was clearly error for the court to admit such testimony for any purpose whatever. The plaintiff should not be permitted to include as a joint tort-feasor one whose relation to the alleged trespass could not be joined, since he was not liable personally for the defective construction of said canal system and could not be liable for damages for seepage therefrom. While the defendant Dewey would be personally liable for his own torts, the facts in this case show that he was not liable for any negligent or faulty construction of said

canal system, as he had no interest or estate in it, since it was the property and under the control of his codefendant.

It was held in *Livesay v. First National Bank,* 36 Colo. 526, 118 Am. St. 120, 86 Pac. 102, 6 L. R. A., N. S., 598, that a failure to prove a joint liability of persons charged as joint tort-feasors is a failure to prove the cause of action alleged, and it is stated in said opinion as follows:

"The great weight of authority supports the principle that where two or more parties act each for himself and independently of each other in a proceeding the results of which may be injurious to another, they cannot be jointly held liable for the acts of each other."

The great weight of authority is that an action at law for damages cannot be maintained against several defendants jointly when each acted independently of the other and there was no concert or unity of design between them, and it is held in such case if the tort of each defendant was several when committed, it does not become joint because afterward its consequences united with the consequences of several other torts committed by other persons.

In *Miller v. Highland Ditch Co. et al.,* 87 Cal. 430, 22 Am. St. 254, 25 Pac. 550, the court said, in referring to this rule: "If it were otherwise, say the authorities, one defendant, however little he might have contributed to the injury, would be liable for all the damage caused by the wrongful acts of all the other defendants; and he would have no remedy against the latter, because no contribution can be enforced between tort-feasors." And numerous authorities are cited in support of that rule.

*Blaisdell v. Stephens,* 14 Nev. 17, 33 Am. Rep. 523, is a case where several defendants were sued for wrongfully flowing waste water from their lands to the injury of plaintiff's ditch and for an injunction to restrain such wrongfully flowing of waste water. It appeared in that case, however, that the defendants owned and irrigated separate and distinct tracts or parcels of land, each in his own right, and they moved for a nonsuit upon the ground that it did not appear that the injury complained of was the result of the joint or

concurrent acts of defendants. The trial court overruled that motion and on appeal the supreme court of Nevada held that the court erred in not sustaining said motion, and said: "The general principle is well settled that where two or more parties act, each for himself, in producing a result injurious to plaintiff, they cannot be held jointly liable for the acts of each other."

In the case at bar, the result of the destruction of plaintiff's land and orchard trees by seepage from the defendants' irrigation system and from seepage from the irrigated lands surrounding the plaintiff's, resulting in a rising water-table, was not damage caused by the joint acts of Dewey and the irrigation district. If Dewey acting for himself opened up the gates of Lake Ethel reservoir and injured the personal property of the plaintiff, the irrigation district could not be held liable for that unlawful act of Dewey; and neither could Dewey be held liable for damages done on account of seepage from said canal system.

The defendants filed a joint answer in this case, denying the most of the material allegations of the complaint, but that does not make them jointly liable. It was held in *Mau v. Stoner et al.*, 15 Wyo. 109, 87 Pac. 434, 89 Pac. 466, that defendants having filed a joint answer did not preclude them from taking advantage of the fact that the proof did not establish the joint liability charged in the complaint.

If the appellant district negligently permitted seepage from its system which caused damage to the plaintiff, under the evidence in this case, defendant Dewey could not be held liable therefor, and the irrigation district could not be prejudiced or bound by any of the alleged conversations had with the defendant Dewey, since it does not appear that Dewey was authorized to speak for the district in said conversations. Some of the conversations introduced in evidence occurred before the irrigation district owned or had any control of said irrigation system.

The natural floods occasioned by rain and snow in the Mason creek drainage basin and watershed, which contains approximately 10,000 acres, necessarily run into Lake Ethel

and from thence down the Mason creek channel to the flat or basin in which the land in controversy is situated, and on the upper end of this flat the flood waters must spread out and run over it since there is no channel across the flat to carry such water.

The plaintiff testified that his land adjoins that involved in the Doran case and that he had lived there eight years, and that there had been several floods during that time. Another witness testified that the annual floods caused by snow and rain came down Mason creek six years out of the nine that he had been there and that the flood water ran through Lake Ethel since that was its natural channel. Another witness testified that he was manager and assistant manager of the Ridenbaugh canal from 1890 to 1901, and that he built the dam across Mason creek creating Lake Ethel in 1890 and 1891; that he has been acquainted with it since, and that it was subject to overflows, from floods coming down Mason creek in the winter time. Another witness testified that he had looked after the Ridenbaugh canal for eighteen years and that during that time there had been four big floods in the Mason creek valley besides the water that came down every winter whenever there were snows and rains, and that the management of that canal favored the Mason creek basin by carrying all the flood waters that their canals would carry into Indian creek, thus relieving Mason creek from a part of the flood waters that would have otherwise naturally flowed therein.

The Ridenbaugh canal crosses the valley about six miles above plaintiff's land, and all the flood waters from below said canal would flow down Mason creek regardless of said canal. Lake Ethel and the Ridenbaugh canal system were constructed long prior to the time that the appellant, the Nampa & Meridian Irrigation District, purchased it in 1906.

As regards the floods, the plaintiff testified that he first knew of a flood coming down that creek from snow or rain in January, 1909, and it went all over the place—spread out over his land; that in 1910 the same thing happened in the month of February; that at that time there was a break-up in

the weather and when the water from Mason creek came down in a flood and got to the upper end of the flat in which his land is situated, it spread out over the land; that two such floods came down in February, the first on the 8th and covered that basin to a depth of five or six inches, and the second came down on the 24th and at that time there was considerable melted snow—there was quite a thaw and the flood was in excess of the capacity of the ditch known as the Beet Sugar Drain ditch.

Another flood occurred on January 13, 1912. Anticipating a heavy flood from the melting of the great amount of snow then lying on the ground, being about sixteen inches deep, the general manager of the appellant corporation, as above stated, requested the defendant Dewey to have the lake opened up and a part of the water drained off, which was done as above stated. And the water thus let out of Lake Ethel flowed down Mason creek and intermingled with the snow. The weather became suddenly colder and froze the snow and water and damage was done to certain personal property belonging to the plaintiff. It appears from the evidence that the general manager of the irrigation district acted in perfect good faith in this matter, believing that a big flood was about to occur, but on account of the change in the weather, certain damage was done to personal property belonging to the plaintiff. The irrigation district admits its liability for such damage and offered at the opening of the trial to permit judgment to be taken against it for the sum of $1,001. The evidence shows, however, that the headgate of Lake Ethel was opened up under the direction of the general manager of the Nampa & Meridian Irrigation District, anticipating a heavy flood, and it clearly shows that it was not maliciously done for the purpose of injuring the defendant or any other person, but was done with the intention of protecting him and other settlers in the basin, as far as possible, from the disastrous effects of a pending flood.

The evidence also shows that the Idaho-Utah Sugar Company was responsible for the breaking of its reservoir and the flood occurring in October, 1911, and promptly settled

with the plaintiff for the damages which he sustained. The floods of February, 1910, were primarily caused by melting snows and rains and some water from Lake Ethel when the reservoir was opened to let the flood waters pass down the creek after overflowing the reservoir. The evidence clearly shows that the floods occurring in the winter season were quite a common occurrence prior to the period charged in the complaint, yet it is not claimed that the plaintiff's orchard suffered any injury from them. That, however, was before the water-table had risen near the surface of the ground. The period charged in the complaint is made to correspond to the precise time when the water-table had risen, and it was then only a question of time when the roots of plaintiff's fruit trees would be destroyed, as they were submerged in water a great deal of the time.

It was estimated by expert witnesses that the loss of water from irrigation in that region of country is about one-half of the water used; that about one-half is lost in subsoil and surface run-off. In that basin where the loss from irrigation is by underground seepage or surface run-off, it all flows into the Mason creek flat or basin and contributes to the water-table, except such part thereof as is carried off by waste ditches or evaporates.

When the Mason creek valley was first settled and until about eight years prior to the trial of this action, those digging wells had to go about forty feet from the surface to get water. From that time on to 1910, the water-table kept gradually rising until in 1910 water appeared to within about sixteen inches of the surface, and during that period the area of irrigated lands was greatly increased, as well as the amount of water used for irrigation, and the record clearly shows that the water-table kept rising in accordance with the amount of water used for irrigation. Almost every year, or perhaps six years out of nine, for the past twenty years quite heavy snows or rains have fallen in said basin and great floods of water from rain and the melting of the snows have inundated said valley almost every winter or spring. It is a significant fact that the water did not begin to rise to any perceptible extent

on account of such storms until the irrigated lands and use of water had greatly increased.

Civil Engineer Milligan, a witness on behalf of the plaintiff, testified that he had lived in the Mason creek basin since April, 1899, but not in the lowest part of the basin; that the water-table then at his place was from thirty-two to thirty-five feet below the surface of the land, and at the time this case was tried it was about ten feet from the surface. "Q. During what time has the water-table been rising? A. It has been rising gradually seven or eight years as the land above has come into irrigation. Q. And the rise of the water-table has not been confined to the bottom, has it, of the Mason creek basin? A. No, sir. Q. It has been rising all over that country? A. Wherever irrigation is above the land it seems to be filling up."

It thus appears from the testimony of plaintiff's own witness that the water-table has come up gradually for seven or eight years, and that such rise of the water-table has not been confined to the bottom of Mason creek basin, and that the rise in the water-table is occasioned partly, at least, by the increase in the irrigation of the land in that basin.

Witness Sloan testified in part as follows: "Q. Now, as a source of the water in the water-table, I will ask if the use of water by irrigation in an irrigated community is not the greatest source of the supply of water in the water-table of the community, referring to the Boise Valley, Idaho. A. Yes, it is. Q. I will ask whether the snowfall does not materially contribute to the water in the water-table from your actual experience. A. Yes."

When said witness, who is an experienced drainage engineer connected with the U. S. Department of Agriculture, first examined the water-table in said Mason creek flat in July, 1911, it was about sixteen inches from the surface. He testified that said water-table extended over the lower portions of said valley, also that he was familiar with the irrigation canals and irrigated lands in said basin and had examined the topography of the country, and testified that in his

opinion the cause or sources of the water supply in the water-table under the land of plaintiff is the seepage from the canals and reservoirs above said land and the irrigation of the lands about it, and that it is practically impossible to operate those canals and reservoirs without some seepage loss, and that it is not practicable to irrigate lands without seepage losses; that, in his opinion, from twenty to forty per cent of the water used for irrigation in said basin goes into the subsoils as seepage from irrigation, and that the greatest source of supply of seepage water in said basin is in the irrigation of the lands. He testified that said water-table could be lowered by drainage and thus remove the surplus water; that there were about 8,000 acres in the Mason creek watershed that could be drained by the same system, and that he had estimated that the amount necessary to construct such a drainage system would be about $8.50 per acre; that said investigation was made partly at the request of some of the land owners while the witness was in the employ of the government, and that it was not made for any of the defendants in this case.

Engineer Horne testified that there was some loss of water from seepage from all of the canals in that region, and that the water turned on to irrigated land is largely lost, some of it being taken up by plant life, some of it by evaporation and some of it by seepage into the ground.

Pittinger, a witness on behalf of the plaintiff, testified that he had a conversation with Horton, the superintendent of the Nampa & Meridian Irr. District, over the phone, and he testified as follows: "We had a heavy fall of snow on at that time. He told me to look out; they were going to turn 2,500 inches more out. I told him we had all the water we wanted down there now and he had better take care of it himself. He said he could not do it; that it would break the bank of the ditch if they did not turn it out. They had to let go of it." He also testified that it took a day and a night to empty Lake Ethel. The following question was propounded to him. "Q. If from the 8th of February to March 1st there was a continuous stream of water running out of Lake Ethel on to

Mason creek flat, there must have been some cause for it above the lake? A. Yes, sir; very evidently there was."

From the evidence it appears that there was a general flood condition in that region of country from the 8th of February to about the 1st of March, and this is fully corroborated by the Weather Bureau report for the month of February, 1910. The following is from page 4 of said report, which was introduced in evidence:

"The winter of 1909–10 in the valleys and open plains in southern Idaho was the severest in point of almost continuously low temperature that has occurred in many years. The ground over large areas remained frozen for several months, and snow accumulated to considerable depths, where the ground is ordinarily bare, except at intervals. The low temperature continued until about the 23d of February, when a marked change to warmer occurred, attended by rain and wind. Under the influence of the warm wave, assisted by the wind and rain, the snow on the plains and foothills and in the lower valleys melted very rapidly. The ground, being frozen, was not in condition to absorb any considerable part of the moisture, hence most of it found its way into the streams at once, causing many of the smaller ones to overflow their banks, and resulting in unusually high water in some of the larger ones. Indian creek, which drains a large area of relatively low-lying country in Ada and Canyon counties, and is ordinarily an unimportant stream, went out of its banks on the 28th at Nampa and Caldwell, inundating considerable portions of both towns, causing some damage and much inconvenience. The electric lines running from Boise to these towns were unable to maintain regular schedules for several days. About the same time the Oregon Short Line railroad track was washed out by the overflow of flats and small streams at a number of places in Elmore, Ada, Twin Falls and Cassia counties, and, as a result, traffic was suspended for about two days and seriously impeded for several days more. The cost of repairs was considerable. The Twin Falls canal in Twin Falls county was damaged seriously and many roads and bridges were washed out in that section.

The heavy flow of water from the foothills flooded some of the streets of Boise, filling cellars, but doing little permanent damage. The total damage in the southern part of the state was probably $100,000. The water was still high at the close of the month.''

It is clear from the record that the water in Lake Ethel did not cause the floods occurring from the 8th of February to the first of March in that region, and no water was running in the Ridenbaugh canal at that season of the year from the river.

Witness Pittinger also testified that a flood in said Mason creek basin to a depth of fifteen inches to two feet would run off if it quit coming in twenty-four to thirty-six hours. He also testified that the water commenced coming down on the 8th of February and kept coming and did not cease until about the 1st of March,—that it was coming practically all of the time from the 8th of February to the 1st of March.

It is clear from the evidence that the water in Lake Ethel contributed but very little to the floods occurring from the 8th of February to the 1st of March, 1910; that those floods were caused from rain and snow and could not have been caused by letting out the water stored in Lake Ethel, since it held only 112 acre-feet of water and could be drained in from twenty-four to thirty-six hours.

It is clear from the evidence that said water-table was not perceptibly raised by the floods caused by the snow and rain, but was raised principally from the seepage from irrigated lands and the canals crossing said Mason creek basin.

The evidence conclusively shows that the killing of the trees in the orchard of appellant was principally caused by the waterlogging of the land—the rising water-table—caused by irrigation and not by letting the water out of Lake Ethel, nor by the floods caused by the rain and snow of that region, for which floods neither defendant was liable.

A section of one of the apple trees grown in said orchard was introduced as an exhibit on the trial, and it shows that the bark was split longitudinally and was in the process of healing over. The exhibit itself showed that the split had oc-

curred several years before 1910, and the evidence shows that this might have occurred from different causes. The plaintiff himself testified in regard to the flood of 1910 and the freezing of the water and as to what he thought killed his orchard trees, and he stated that it was not the bursting of the bark alone that killed them, but that helped some, and he believed it was the floods and the seepage that killed his orchard; that he supposed the wounds made on the tree by the splitting of the bark would have healed had it not been for the seepage or the rising of the water-table. This orchard was eighteen or twenty years old, and the floods that came down that basin up to 1910 had not caused the water-table to rise or injured the orchard in any way, so far as the evidence shows, and it is clear that said orchard was injured but very little by any cause except the rising of the water-table of said basin caused by the seepage from irrigated lands and the canals crossing said Mason creek watershed.

The defendant Dewey is not personally liable for the maintenance and operation of said canals or reservoir and was not liable in any way for the seepage occurring therefrom.

The fact that Dewey was president of the board of directors of said irrigation district would not make him personally liable for any damage arising from the operation of said canal, even though such operation were negligently done. Whatever damage the plaintiff sustained to his personal property by reason of Lake Ethel having been emptied of its water, under the direction of the proper officers of the irrigation district, Dewey would not be personally liable for, unless he, as an officer, maliciously had it done; but the Nampa & Meridian Irrigation District would be liable if it had negligently emptied said reservoir and injured the property of the plaintiff. If Dewey, on his own account, had the boards in said headgate removed and let the water out of Lake Ethel to the injury of plaintiff's personal property, he would be personally liable for such injury, and his codefendant, the irrigation district, would not be liable therefor. If Lake Ethel was emptied by direction and under the authority of the irrigation district, Dewey would not be per-

sonally liable for any damages done thereby. The seepages from the reservoir and canals, and from the irrigated lands, if trespasses, were entirely disassociated from the acts alleged to have been done by Dewey; and yet the personal acts alleged, or shown by the evidence, to have been done by Dewey are all joined together in this action with the seepage of water from said canal system and the rising of the water-table, and both defendants are held liable under this judgment for their own individual acts of alleged trespass and the individual and personal acts of his codefendant. This was clearly error.

It should be remembered that the channel of Mason creek runs through Lake Ethel reservoir, and when great natural floods came down said channel, the manager of the district endeavored to have the water pass with the least possible injury to the reservoir and the lands below. It was attempted to be shown that the water from said lake inundated the valley from a foot to two feet, when it was established beyond any doubt that the entire capacity of the lake, if filled with water and let out at once, would not cover said valley more than two and a half inches deep. The valley having an incline or fall of about fifteen feet to the mile, the water would soon run off unless it was augmented by rainstorms and melting snows, which the evidence clearly shows was the case.

In lowering the lake, the evidence shows that the water was gradually drained out; and to hold the defendant Dewey liable for damage caused by the rising water-table, even if it be conceded that that was caused by seepage from said reservoir and canals, would be to hold him liable for something he could not be held responsible for under the evidence, as he does not own or control the operation of said canals and reservoir.

The giving of instruction No. 3 is assigned as error. Said instruction is in part as follows: "You are instructed that the law demands that the owner of an irrigation ditch and works used in connection therewith shall have them properly constructed, managed and operated; and in this case it was the duty of the defendants to so construct, manage, operate

and control the irrigation canal, reservoir and waste ditch herein described, . . . . and if through such intentional fault or careless acts of defendants, if any, in not constructing, managing, operating or controlling said ditches and reservoir, the water therefrom flowed over and upon or seeped in, through and under the lands of plaintiff, and thereby caused damage to plaintiff's said lands or property, the defendants are responsible for such damages as the evidence may show the plaintiff to have actually sustained thereby.''

This instruction is clearly error, since the evidence clearly shows that the defendant Dewey personally had nothing to do with the construction, maintenance or operation of said canal, and could not be held liable for the faulty construction thereof or the seepage resulting therefrom.

The giving of instruction No. 4 is also assigned as error. Said instruction is in part as follows: ''You are further instructed that if you find from the evidence that defendants caused waters from other sources or channels to be collected by and carried through the Ridenbaugh canal to Mason creek,'' etc.

This instruction was clearly error, for the reasons above stated in relation to instruction No. 3. There is no evidence that shows that Dewey caused the water from other sources or channels to be collected and carried through the Ridenbaugh canal.

The giving of instruction No. 9 is assigned as error. Said instruction is in part as follows: ''You are instructed that in an action for trespass to real estate, such as the one here under consideration, where there are elements of malice, insult or deliberate oppression, exemplary damages may be allowed.''

Under the evidence in this case the court ought to have instructed the jury that the evidence would not justify the allowance of any punitive damages whatever. There was no legal evidence whatever of any malice, insult or deliberate oppression in this case. Even if the defendant Dewey were prompted by malicious motives in the acts that he did in the matter, such motives cannot be given in evidence in order to recover punitive damages against the irrigation district. One

defendant cannot be made liable on account of the malicious motives of his codefendant unless his codefendant is implicated in such malice. (See *Nightingale v. Scannell*, 18 Cal. 315; 38 Cyc. 1161.)

The complaint was evidently drawn upon the theory of joint ownership and operation of said canal system by the defendants and the joint and continuous trespass in certain particulars, and the evidence does not support the theory of joint ownership and operation of said canal system, and does not support the theory of joint or continuous trespass by the defendants.

It was clearly error for the court to give the above instructions.

The denial of defendant Dewey's motion for a nonsuit is assigned as error. The action of the court in that matter was clearly error, since the evidence shows that the defendant Dewey was not responsible for the faulty construction of said canal system and reservoir, if there were any fault in such construction, and was not liable for the operation of said canal and could not be held liable for seepage occurring therefrom.

In our view of the matter, it will not be necessary for us to pass upon the assignment of error directed to the action of the court in overruling the defendants' motion to tax the costs, since a new trial must be granted, and the costs of the trial already had cannot be taxed against the appellants.

Since the judgment must be set aside and a new trial granted, it will not be necessary for us to pass upon the other errors assigned.

The record shows that the court tried the case upon the wrong theory; that it admitted incompetent evidence; gave erroneous instructions, and erred in rendering judgment against the defendants jointly for alleged trespasses that the evidence shows were committed by each defendant separately, and in which there was no concerted action as to time, place or act.

For the foregoing reasons, the judgment must be reversed and a new trial granted, and it is so ordered, and the cause

remanded for further proceedings in accordance with the views expressed in this opinion. Costs awarded to the appellants.

Budge and Morgan, JJ., concur.

Petition for rehearing denied.